# U.S. BANKRUPTCY COURT
## District of South Carolina

Case Number: **11-06800-jw**

Adversary Proceeding Number: **13-80138-jw**

### ORDER GRANTING TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The relief set forth on the following pages, for a total of 15 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**01/13/2015**



*US Bankruptcy Judge*
District of South Carolina

Entered: 01/13/2015

**UNITED STATES BANKRUPTCY COURT**

**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re,<br><br>NMFC, LLC,<br><br>                                              Debtor(s). | C/A No. 11-06800-JW<br><br>Adv. Pro. No. 13-80138-JW<br><br>Chapter 7 |
| John K. Fort, Chapter 7 Trustee for NMFC, LLC f/k/a Innegrity, LLC,<br><br>                                              Plaintiff(s),<br><br>v.<br><br>Innegra Technologies, LLC;<br>Brian G. Morin;<br>Dreamweaver International, Inc.,<br><br>                                              Defendant(s). | **ORDER GRANTING TRUSTEE'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |

This matter comes before the Court on the Motion for Partial Summary Judgment ("Motion"), filed by John K. Fort, Chapter 7 Trustee ("Trustee") for NMFC, LLC f/k/a Innegrity, LLC. In the Motion, the Trustee moves for summary judgment on the Second Cause of Action in the Amended Complaint against Defendant Innegra Technologies, LLC, which seeks a declaratory judgment that the Trustee is the sole owner of certain trade secrets relating to battery separator technology and any resulting commercial tort claims and/or patents arising therefrom. Innegra Technologies, LLC ("Innegra") filed a response in opposition to the Motion. Brian G. Morin ("Morin") and Dreamweaver International, Inc. ("Dreamweaver"), did not file a response in opposition to the Motion.[1] This Court has jurisdiction over this adversary proceeding under

---

[1] At the hearing on the Motion, counsel for the Trustee indicated that Morin and Dreamweaver agree that the Trustee owns the Battery Separator Claims and Battery Separator Technology, but disagree that they are currently using such technology. Counsel for Morin and Dreamweaver agreed with this characterization of its position, stating that "to the extent there is a claim [for improper use of the Battery Separator Technology] to be made, it is the Trustee's claim to make."

28 U.S.C. §§ 1334(b) and 157(b)(1), as a proceeding arising in or related to the Chapter 11 bankruptcy case of NMFC, LLC.[2] Pursuant to Fed. R. Civ. P. 52, which is made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052, the Court makes the following findings of fact and conclusions of law:[3]

## FINDINGS OF FACT

1. On May 19, 2004, Morin founded Innegrity, LLC, which is now known as NMFC, LLC ("Debtor"). Debtor was an advanced material company which was in the business of developing, manufacturing, and marketing composite fibers, including the Innegra S fiber. Morin served as the founder, president and Chief Executive Officer of Debtor, and was employed by Debtor from its inception. He was also the inventor of the melt-spun multifilament polyolefin yarn formation processes which were used by Debtor to manufacture composite fibers.

2. Pursuant to a security agreement made between Appalachian Development Corp. ("ADC") and Debtor on June 22, 2006, ADC took a security interest in certain assets of Debtor, including all Inventory; all General Intangibles; all Accounts; all Chattel Paper; all Instruments and Documents and any other instrument or intangible representing payment for goods or services; all Equipment, including furniture; all Commercial Tort Claims; all Letter-of-Credit Rights; all parts, replacements, substitutions, profits, products, Accessions and cash and non-cash Proceeds and Supporting Obligations of any of the foregoing (including but not limited to, insurance proceeds) in any form and wherever located.

---

[2] By Joint Stipulation filed September 29, 2014, the parties have expressly consented to this Court entering final orders and judgments in this proceeding. If it is subsequently determined that this Court does not have authority to enter this Order as a final order, the Court submits the following as proposed findings of fact and conclusions of law to the United States District Court for review.

[3] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such; and to the extent any of the following conclusions of law constitute findings of fact, they are likewise so adopted.

3. Pursuant to a security agreement made between Branch Banking and Trust Company ("BB&T") and Debtor on October 3, 2008, BB&T obtained a security interest in certain assets of Debtor, including the following:

> General intangibles, including all Payment Intangibles, copyrights, trademarks, patents, tradenames, tax refunds, company records (paper and electronic), rights under equipment leases, warranties, [and] software licenses….

4. In June of 2008, Morin entered into an Employment Agreement with Debtor. Section 9(b) of the Employment Agreement provides, in pertinent part, that:

> [Morin] covenants and agrees that all right, title and interest in any Protected Information shall be and shall remain the exclusive property of [Debtor]. [Morin] agrees to assign, and automatically assign at the time of creation of the Protected Information, without any requirement of further consideration, any right, title or interest that [Morin] may have in such Protected Information.

"Protected Information" is defined in Section 9(a) of the Employment Agreement as:

> [A]ll materials and information (whether or not reduced to writing and whether or not patentable or protectable by copyright and whether or not of the [Debtor] or received by [Debtor] or [Morin] from a third party) which [Morin] receives, gains access to, conceives or develops or has received, gained access to, conceived or developed, in whole or in part, directly or indirectly, in connection with [Morin]'s employment with [Debtor] or in the course of [Morin]'s employment with [Debtor].

5. On November 5, 2010, Morin was terminated without cause by resolution of the Board of Directors of Debtor.

6. In December of 2010, Morin and James Schaeffer started a new company, Dreamweaver International, Inc.

7. On December 15, 2010, BB&T sent Debtor a Notice of Default and Demand letter, indicating that the total debt owed to BB&T at that time was $709,654.93.

8. On August 26, 2011, BB&T posted a Notice of Public Sale, indicating that it would conduct a public sale on September 7, 2011 at 12:00 p.m. for the purpose of selling

personal property of Innegrity, LLC, consisting of equipment, accounts, certain general intangibles (specifically including payment intangibles, copyrights, trademarks, patents, tradenames, tax refunds, company records, rights under equipment leases (excepting leases of two 1990 STP Impianti SP-4 finber machines), warranties and software licenses), supporting obligations and proceeds. The Notice also indicated that ADC has joined in the sale for purposes of enforcing its Security Agreements which cover, in addition to the categories described above, inventory of Innegrity, LLC.

9. On September 7, 2011, BB&T and ADC conducted a UCC sale ("UCC Sale") in which all assets of Debtor were sold to the successful bidder, Rampart Fibers, LLC. The Bill of Sale to Rampart Fibers, LLC, executed on September 7, 2011, provides, in pertinent part, that the following general intangibles were transferred to Rampart Fibers, LLC in connection with the sale:[4]

> All Payment Intangibles, copyrights, trademarks, patents, tradenames, tax refunds, company records…, rights under equipment leases…, warranties and software licenses; general intangibles to include ***all Intellectual Property used by Innegrity in the manufacture, sale or other commercialization of performance fibers*** (including but not limited any fibers offered using the name INNEGRA), including but not limited to the interest of Innegrity, LLC in the patents, applications and trademarks shown on the list attached as Exhibit C. (emphasis added)

10. Rampart Fibers, LLC, subsequently changed its name to Innegra Technologies, LLC ("Innegra"), and is a Defendant in this action.

---

[4] ADC also executed a Bill of Sale on September 7, 2011, providing for the transfer of all right, title and interest of Debtor in all inventory to Rampart Fibers, LLC.

4

11. Following the UCC Sale, Innegra reviewed the internal documents and emails of Debtor and discovered some communications regarding Debtor's work in the field of battery separator technology.[5]

12. On October 24, 2011, Innegra filed an action in state court against Morin and Dreamweaver International, Inc., asserting, among other things, a claim that certain intellectual property, including but not limited to trade secrets that were the property of Debtor, which now belong to Innegra as a result of the UCC Sale, was improperly disclosed to Daramic, LLC, a supplier of high performance polyethylene battery separators to the lead acid battery industry, and is being used improperly by Morin and/or Dreamweaver ("Innegra State Court Action"). Innegra's complaint alleges that the trade secrets were used to develop and commercialize certain patent pending battery separator technology owned by Dreamweaver.

13. On November 1, 2011, Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

14. On July 19, 2013, Innegra filed a motion seeking an order granting relief from the automatic stay to allow it to proceed with the Innegra State Court Action.

15. On August 29, 2013, the Trustee commenced this adversary proceeding by filing a Complaint seeking, among other things, a declaratory judgment that the Trustee owned the battery separator technology.

16. On October 22, 2013, Innegra's motion for relief from stay was resolved by consent order which allowed Innegra to pursue some of its state law claims against Morin and Dreamweaver International, Inc., including its claims regarding the improper disclosure of trade

---

[5] A battery separator is "an insulating plate inserted between the positive and negative places of a battery to prevent them from touching." McGraw-Hill Dictionary of Scientific & Technical Terms, 6E. (2003), *available at* http://encyclopedia2.thefreedictionary.com/battery+separator (last visited Jan. 5, 2015).

5

secrets and improper use of trade secrets to develop and commercialize battery separator technology.[6]

17. At the hearing on the Motion for Partial Summary Judgment, the Trustee presented into evidence portions of the deposition of Elizabeth Cates, Ph. D. ("Dr. Cates"), who was director of research and development for Debtor and is now Vice President of research and development at Innegra, and the testimony of Morin.[7] Based upon this testimony and the materials in the record, the Court finds as follows:

   a. The Innegra S fiber is a high-strength polyprophylene based fiber yarn and was the main product of Innegrity.

   b. Innegrity had identified that the Innegra S fiber could be fibrillated through the use of high-pressure water jets and was contemplating writing a patent to protect that information and process before any extensive work was done to show this technology to others. Fibrillating the Innegra fiber was potentially a low-cost way to create micro and nanofibers. Micro and nanofibers have a very wide range of uses industrially and commercially, including use as components of battery separators.

   c. The fibrillation of the Innegra fiber was originally done by Mario Perez at 3M Company. 3M Company has a patent that covers fibrillated Innegra fiber. Innegrity was forbidden to commercialize fibrillated Innegra fiber by the license it had with 3M.

---

[6] The automatic stay was left in place with regard to Innegra's claims relating to the 007 Patent Application.
[7] The Trustee also presented the deposition testimony of Mark Smith, Innegra's President, who testified that Dr. Cates is the individual currently employed by Innegra that is most familiar with the products, trade secrets, patents, general business model and applications of the Innegrity products that Innegra purchased.

    d. Innegrity was holding, as a trade secret, the fact that the Innegra S fiber could be fibrillated.

    e. Innegrity did not ever sell fibrillated Innegra fiber.

    f. Dr. Cates had a phone call with an individual named James Schaeffer ("Schaeffer"), who was not an employee of Debtor, to discuss how to proceed with Daramic, LLC, who was a potential customer for battery separator materials.

    g. She discussed with Schaeffer the possible application of fibrillated Innegra fibers for use in battery separators, without explicitly discussing nanofibers versus microfibers, or how such a structure might be created.

    h. On September 6, 2010, Schaeffer sent an email to a contact at Daramic, LLC, asking for contact information for the individual he should contact to discuss a potential battery separator substrate material. In the e-mail, Schaeffer writes "The material has nano sized pore sizes, but I will need to check with your contact to see if we will be in the ball park [with respect to] your needs."

    i. On September 8, 2010, Schaeffer sent an email to Morin, writing:

> "I wanted to check in with you around the status of the development work that you showed me [with respect to] the resultant nano fabric sample.
>
> Do you have an estimated filing date for the patent on this product yet?
>
> Have you been able to characterize the fabric properties as to basis weigth, filament size, porosity, etc.
>
> Also in the patent application or in an additional patent application, along with filtration as a potential product category, will you consider including applications such as battery separators…[?] …

     Depending on the resultant properties, the battery separator field could be substantial. I have a great contact within Polypore, the battery separatory business in Charlotte that President Obama visited a few months ago and they are specifically looking for a PP nano web for use in battery separator applications. Thickness is a consideration, but I obviously haven't talked to them without a CDA or before talking to you about the strategy around this potential market."

  j. Morin responded to Schaeffer by e-mail sent on September 11, 2010: "I am hoping to have the patent filed by the end of October. The fabric properties will be dependent upon the fabric that we start with, and that is something we can taylor to the needs of a particular application. For now, I think we need to think about how to have some developmental fabrics made. Elizabeth will be at 3M in a few weeks, so she can set up a meeting then to try to figure out how to make better samples."

  k. Dr. Cates received an e-mail on October 4, 2010, sent by Jim Schaeffer to Kevin Whear of Daramic, to set up a conference call on October 5, 2010, to "discuss the critical needs of a battery separator substrate so as Elizabeth gets the trial schedule set up, we have some information that may get us closer to an acceptable material right out of the box."

  l. Dr. Cates was not able to participate in the conference call on October 5, 2010 with Mr. Schaeffer and Duramic.

 18. Dr. Cates specifically testified that "the fibrillated Innegra fiber was never commercialized by either Innegrity or Innegra Technologies, to date." Morin also testified that the Innegra fiber was not ever commercialized.

8

**ARGUMENTS OF THE PARTIES**

The Second Claim for Relief in the Amended Complaint for a declaratory judgment that the battery separator technology is property of Debtor's estate is based upon the Trustee's argument that the battery separator technology was not sold to Innegra at the UCC Sale either because the battery separator technology did not fall within the definition of "general intangibles" under BB&T's Bill of Sale, which was defined as including "all Intellectual Property used by Innegrity in the manufacture, sale or other commercialization of performance fibers," or because the battery separator technology is a "commercial tort claim"[8] and no commercial tort claims were sold at the UCC Sale by either BB&T or ADC. Therefore, the Trustee argues that the battery separator technology trade secrets were retained by Debtor and are owned by its estate.

In its Response, Innegra agrees that it does not assert ownership of the battery separator technology as a commercial tort claim sold to it by either BB&T or ADC, but argues that there is a genuine issue of material fact as to whether the battery separator technology trade secrets were transferred to it as a general intangible by BB&T's Bill of Sale. Under the terms of the Bill of Sale from BB&T, Innegra received "all Intellectual Property used by Debtor in the manufacture, sale or other commercialization of performance fibers." If the battery separator technology trade secrets were used by Debtor in the manufacture, sale or other commercialization of performance fibers, then Innegra bought those trade secrets at the UCC Sale.

---

[8] In the Amended Complaint, the Trustee alleges that the battery separator technology trade secrets were misappropriated and are currently in use by Morin and/or Dreamweaver and are thus a commercial tort claim.

9

**ISSUE**

Whether trade secrets relating to battery separator technology constitute general intangibles of Debtor that were transferred to Innegra via the Bill of Sale from BB&T, which expressly defined "general intangibles" as including all Intellectual Property used by Debtor in the manufacture, sale or other commercialization of performance fibers.

**CONCLUSIONS OF LAW**

I. **Summary Judgment Standard**

Under Fed. R. Civ. P. 56, which is made applicable to adversary proceedings by Fed. R. Bankr. P. 7056, summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact. Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 718-19 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). "[T]he burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Temkin, 945 F.2d at 718-19 (citing Anderson, 477 U.S. at 247-48). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only, admissions, interrogatory answers, or other materials or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P.

56(c)(1). When demonstrating that there is a genuine dispute of material fact, the nonmoving party must satisfy its burden by more than a "scintilla of evidence." Anderson, 477 U.S. at 252. The nonmoving party must present evidence upon which a jury could reasonably find in his favor. Id. At the summary judgment stage, the Court must "draw all reasonable inferences in favor of the nonmoving party and may not make credibility determinations or weigh the evidence." Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004).

## II.     Analysis

### a. *No commercial tort claims were sold at the UCC Sale to Innegra.*

Since Innegra concedes that it does not assert that the battery separator technology was a commercial tort claim previously owned by Innegrity, there is no genuine issue of material fact as to whether any commercial tort claims were sold at the UCC Sale and the Trustee is entitled to judgment as a matter of law that no commercial tort claims relating to the battery separator technology were sold to Innegra.

### b. *The battery separator technology does not constitute intellectual property used by Debtor in the manufacture, sale or other commercialization of performance fibers.*

The Bill of Sale from BB&T to Innegra is a contract subject to general rules of contract interpretation. "Under South Carolina law, 'when a contract is unambiguous, clear and explicit, it must be construed according to the terms the parties have used, to be taken and understood in their plain, ordinary and popular sense.'" In re Daufuskie Island Properties, LLC, 431 B.R. 612, 622 (Bankr. D.S.C. 2009) (quoting C.A.N. Enters., Inc. v. S.C. Health & Human Servs., 373 S.E.2d 584, 586 (1988)). In a general context, "commercialize" is commonly defined as "to apply methods of business to for profit" or "to do, exploit, or make chiefly for financial gain." The American Heritage Dictionary of the English Language 371 (4th ed. 2000). In the business

11

context, commercialization is the process by which a business introduces a new product or service into the general market.[9]

The Trustee has presented into evidence the deposition testimony of Dr. Cates and Morin, both of whom testified that the battery separator technology was never manufactured, sold or otherwise commercialized by Debtor. The testimony of Dr. Cates, who is a current employee of Innegra, was clear that the fibrillated Innegra S fiber, which had the potential for use as a component of battery separator technology, was never commercialized by Debtor. Morin's testimony revealed that Debtor was in fact forbidden to commercialize the fibrillated Innegra S by its license agreement with 3M, who held a patent on the fibrillated Innegra S fiber. Based on this evidence, the Court finds that the Trustee has met his initial burden of demonstrating that no genuine issue of material fact exists on this issue and the burden shifts to Innegra to go beyond its pleadings and respond by designating particular parts of materials in the record which present "specific facts showing there is a genuine issue for trial." Emmett v. Johnson, 532 F.3d 291, 297 (4th Cir. 2008) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Furthermore, "the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict." Thompson Everett, Inc. v. Nat'l Cable Adver., L.P., 57 F.3d 1317, 1322-32 (4th Cir. 1995).

Innegra argues that there is evidence creating a genuine issue of material fact as to whether Debtor's knowledge of the battery separator technology was used in the sale, manufacture or commercialization of performance fibers. Specifically, Innegra relies on the Dr. Cates' testimony that she and Schaeffer discussed the use of fibrillated Innegra fiber as a

---

[9] See *Commercialization Definition*, http://www.investopedia.com/terms/c/commercialization.asp (last visited Jan. 12, 2015).

component of a battery separator structure and how to proceed with Daramic, LLC, as a potential customer for battery separator materials. Innegra also argues that the September 6, 2010 e-mail from Schaeffer to a contact at Daramic, LLC, the September 8, 2010 e-mail from Schaeffer to Morin, the Spetember 11, 2010 e-mail from Morin to Schaeffer, and the October 4, 2010 e-mail sent by Schaeffer to Kevin Whear of Daramic, LLC, together show Debtor's efforts to commercialize the battery separator technology.[10]

In addition, Innegra attaches deposition testimony of Schaeffer, where he stated "what I was doing is I was looking to create a market opportunity and then buy the filament from Innegrity, and then turn around and sell it to Daramic." However, no evidence has been presented to indicate Schaeffer's relationship with Debtor or that he was authorized to act on behalf of Debtor to market the fibrillated Innegra fiber for use as a battery separator. Therefore, this testimony would not support a reasonable jury's conclusion that *Debtor* used its knowledge of battery separator technology in the sale, manufacture or commercialization of performance fibers.

The evidence before the Court shows only preliminary discussions about a possible application for the fibrillated Innegra S fiber as a component of a battery separator. Development was at such an early stage that Debtor was still looking for guidance on what features a product would need to be of interest to a potential buyer, had not yet established how such a product would be created, what properties the product would have (weight, filament size or porosity), had not yet set up a trial schedule for the product, and had not yet drafted a patent for the product. Viewing the totality of the materials in the record, there is no evidence of a sale, an offer to sell, or other attempt to introduce a battery separator or their knowledge of such a

---

[10] No objection was made by the Trustee asserting that any of these materials cannot be presented in a form that would be admissible in evidence pursuant to Fed. R. Civ. P. 56(c)(2).

product into the marketplace by Debtor. The only reasonable conclusion is that Debtor's use of its battery separator technology trade secrets was limited to the preliminary stages of research and development—it was merely evaluating the needs and specifications of a potential battery separator in the event that it ultimately decided to develop and market such a product. Debtor never reached the commercialization stage of introducing the product into the market. The testimony of Innegra's own employee, Dr. Cates, was that the fibrillated Innegra fiber for use as a battery separator had not been "commercialized," which was further corroborated by Morin's testimony.[11] The Court finds that the evidence presented by Innegra is not sufficient to support a reasonable jury's conclusion that the battery separator technology trade secrets were used by Debtor in the manufacture, sale or other commercialization of performance fibers. Therefore, under the terms of the Bill of Sale, such trade secrets were not transferred to Innegra and remain the property of the bankruptcy estate of Debtor and thus are subject to the control of the Trustee.

## CONCLUSION

Based upon the foregoing, the Court concludes that Innegra has failed to demonstrate a genuine dispute of material fact exists as to whether the trade secrets relating to battery separator technology constituted Intellectual Property used by Debtor in the manufacture, sale or other commercialization of performance fibers. Accordingly, the Trustee is entitled to summary judgment on his claim for a declaratory judgment that he is the sole, lawful owner of any trade secrets relating to battery separator technology.

**AND IT IS SO ORDERED**.

---

[11] The Court notes that the term, "commercialize," appears to be a term commonly used in the industry in which Dr. Cates in employed and her testimony indicated her familiarity with its usage and meaning in that industry. This term is not included as a defined term within Black's Law Dictionary (9th ed. 2009) and does not appear to be a legal term requiring legal knowledge to explain its meaning.