## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF SOUTH CAROLINA

In re,

NMFC, LLC,

Debtor(s).

John K. Fort, Chapter 7 Trustee for NMFC, LLC f/k/a Innegrity, LLC,

Plaintiff(s),

v.

Innegra Technologies,LLC;
Brian G. Morin;
Dreamweaver International, Inc.,

Defendant(s).

C/A No. 11-06800-JW

Adv. Pro. No. 13-80138-JW

Chapter 7

**ORDER GRANTING INNEGRA TECHNOLOGIES, LLC'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

This matter comes before the Court on Defendant Innegra Technologies, LLC's Motion for Partial Summary Judgment ("Motion"), which seeks dismissal of the Chapter 7 Trustee's claim seeking a declaratory judgment that the Trustee is the sole owner of U.S. Patent Application No. 12/610,007 ("007 Application"), including the rights to the invention described in the Application and continuation Patent Applications No. 13/672,690 and 13/947,912. Innegra Technologies, LLC further seeks summary judgment on its counterclaim seeking a declaratory judgment that it is the sole owner of the 007 Application. The Plaintiff, John K. Fort, Chapter 7 Trustee for NMFC, LLC ("Trustee") filed a response in opposition to the Motion. Defendants Brian G. Morin and Dreamweaver International, Inc. did not file responses to the Motion and have not otherwise asserted ownership rights in the 007 Application. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 1334(b) and 157(b)(1), as a proceeding arising in or related to the Chapter 7

bankruptcy case of NMFC, LLC.[1]  Pursuant to Fed. R. Civ. P. 52, which is made applicable to this adversary proceeding by Fed. R. Bankr. P. 7052, the Court makes the following findings of fact and conclusions of law:[2]

## FINDINGS OF FACT

1.    On May 19, 2004, Brian G. Morin ("Morin") founded Innegrity, LLC, which is now known as NMFC, LLC ("Debtor").  Debtor was an advanced material company which was in the business of developing, manufacturing, and marketing composite fibers.  Morin served as the founder, president and Chief Executive Officer of Debtor, and was employed by Debtor from its inception.  He was also the inventor of the melt-spun multifilament polyolefin yarn formation processes which were used by Debtor to manufacture composite fibers.

2.    On November 5, 2004, Morin executed an Assignment of Worldwide Rights ("Original Patent Assignment"), which assigned to Debtor his "entire right, title, and interest in and to [the melt-spun multifilament polyolefin yarn formation processes and yarns formed therefrom] and [U.S. Patent Application No. 10/983,153], and all divisions, and continuations thereof, and all Letters Patent of the United States which may be granted thereon, and all reissues thereof, and all rights to claim priority on the basis of such applications, and all applications for Letters Patent which may hereafter be filed for this invention in any foreign country, and all extensions, renewals, and reissues thereof...."

---

[1] By Joint Stipulation filed September 29, 2014, the parties have expressly consented to this Court entering final orders and judgments in this proceeding.  If it is subsequently determined that this Court does not have authority to enter this Order as a final order, the Court submits the following as proposed findings of fact and conclusions of law to the United States District Court for review.

[2] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such; and to the extent any of the following conclusions of law constitute findings of fact, they are likewise so adopted.

3.      Morin entered into an Employment Agreement with Debtor which had an effective date of June 2008.  The Employment Agreement provided that Debtor would pay Morin a base salary of $140,000 per year.  Section 9(b) of the Employment Agreement provides, in pertinent part, that:

> [Morin] covenants and agrees that all right, title and interest in any Protected Information shall be and shall remain the exclusive property of [Debtor]. [Morin] agrees to assign, and automatically assign at the time of creation of the Protected Information, without any requirement of further consideration, any right, title or interest that [Morin] may have in such Protected Information.

"Protected Information" is defined in Section 9(a) of the Employment Agreement as:

> [A]ll materials and information (whether or not reduced to writing and whether or not patentable or protectable by copyright and whether or not of the [Debtor] or received by [Debtor] or [Morin] from a third party) which [Morin] receives, gains access to, conceives or develops or has received, gained access to, conceived or developed, in whole or in part, directly or indirectly, in connection with [Morin]'s employment with [Debtor] or in the course of [Morin]'s employment with [Debtor].

4.      On April 15, 2009, Morin's salary was reduced by Debtor by 15%.

5.      Sometime between April 15, 2009 and October 30, 2009, during the course of his employment with Debtor, Morin conceived of and developed an invention described as "High Modulus Polyolefin Fibers Exhibiting Unique Microstructural Features," a high-strength fiber that is primarily used for reinforcement of composite materials, but is also used for ropes and webbing.

6.      This invention was the subject of U.S. Patent Application No. 12,610,007 ("007 Application"), filed with the U.S. Patent Office by William Parks ("Parks"), a patent attorney employed by Debtor, on October 30, 2009. Morin assisted Parks in the preparation of the 007 Application.  Morin is listed as the Inventor on the 007 Application, and

Innergrity, LLC is listed as the Assignee.[3]   The 007 Application indicates that it is a "continuation of application No. 11/458,530, filed on Jul. 19, 2006, which is a division of application No. 10/983,153, filed on November 5, 2004, now Pat. No. 7,074,483."

7.     Morin testified in his deposition that he refused Parks' request that he execute an assignment at the time of the filing of the 007 Application on or before October 30, 2009.  He also testified that, at that time, he was continuing to perform his duties in good faith with the expectation that his salary would be caught up and paid according to his employment contract and that he had no expectation that Debtor would breach his employment contract at all or certainly to the extent that they did.

8.     On November 2, 2009, Parks filed a corrective application with respect to the 007 Application to correct the original application's reference to the patent being a divisional application[4] when it was in fact a continuation-in-part,[5] but did not change the Application's listing of Debtor as the assignee.

9.     A year after the filing of the 007 Application, on November 5, 2010, Morin was terminated without cause by resolution of the Board of Directors of Debtor.

10.     On December 14, 2010, Morin filed a complaint against Debtor in the South Carolina Court of Common Pleas, civil action number 2010-CP-23-10103 ("Morin State

---

[3] Morin testified that he reviewed the specification of the patent application prior to filing, but did not review the header information.  He further testified that when filing patents, he works closely together with the patent lawyer to prepare the patent.

[4] A divisional application is "a later application for an independent or distinct invention disclosing and claiming (*only a portion of and*) only subject matter disclosed in the earlier or parent application."  Glossary of Terms, United States Patent and Trademark Office, *available at* www.uspto.gov/main/glossary/index.html (last visited Dec. 31, 2014).  A divisional application is used where the parent application contains more than one invention, and is often filed as a result of a restriction requirement made by the USPTO examiner.  United States Patent and Trademark Office, Manual of Patent Examining Procedure § 201.06 (8th ed. Aug. 2012), *available at* http://www.uspto.gov/web/offices/pac/mpep/mpep-0200.html.

[5] A continuation-in-part is "an application filed during the lifetime of an earlier nonprovisional application, repeating some substantial portion or all of the earlier nonprovisional application and adding matter not disclosed in the earlier nonprovisional application." Id. at § 201.08.

Court Action"), asserting claims for failure to pay wages, breach of employment agreement, breach of employment agreement accompanied by a fraudulent act, and specific performance.

11.     On September 7, 2011, Debtor's secured creditor, Branch Banking & Trust ("BB&T") conducted a UCC sale ("BB&T Sale") in which all assets of Debtor were sold to the successful bidder, Rampart Fibers, LLC.[6]   The Bill of Sale to Rampart Fibers, LLC, provides, in pertinent part, that the following intangible assets were transferred to Rampart Fibers, LLC in connection with the sale:

> All Payment Intangibles, copyrights, trademarks, patents, tradenames, tax refunds, company records…, rights under equipment leases…, warranties and software licenses; general intangibles to include all Intellectual Property used by Innegrity in the manufacture, sale or other commercialization of performance fibers (including but not limited any fibers offered using the name INNEGRA), including but not limited to the interest of Innegrity, LLC in the patents, applications and trademarks shown on the list attached as Exhibit C.

Exhibit C included, among other patents, applications, and trademarks, the following:

1) Innegra S Fiber; Serial #10/983,153; Patent #7,074,483; Title: Melt-spun multifilament polyolefin yarn formation processes and yarn formed therefrom;
2) Innegra S Fiber; Serial #11/438,515; Patent #7,445,842; Title: Melt-spun multifilament polyolefin yarn formation processes and yarn formed therefrom;
3) Innegra S Fiber Production Method, Serial #11/438,530; Title: Melt-spun multifilament polyolefin yarn formation processes;
4) Innegra S Fiber (microstructural features), Serial # 12/610,007; (not published yet); (application still pending); Title: High Modulus Polyolefin Fiber Exhibiting Unique Microstructural Features (the 007 Application).

12.     On September 19, 2011, Morin filed a Change of Correspondence Address with the U.S. Patent Office regarding the 007 Application.

13.     Rampart Fibers, LLC subsequently changed its name to Innegra Technologies, LLC ("Innegra"), and is a Defendant in this action.

---

[6] Morin testified that Parks also asked him to execute an assignment of the 007 Application to Debtor immediately prior to the BB&T Sale, which he refused.

14.     On October 24, 2011, Innegra filed an action in state court against Morin and Dreamweaver International, Inc. for a declaratory judgment that it had properly purchased the 007 Application at the UCC Sale ("Innegra State Court Action").[7]

15.     On November 1, 2011, Debtor filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

16.     On January 20, 2012, Morin filed a Motion for Relief from Stay in the underlying bankruptcy case to obtain an order modifying the automatic stay to allow the Morin State Court Action to go forward.

17.     On May 12, 2012, a Consent Order resolving Morin's Motion for Relief from Stay was entered, which provided for the lifting of the stay with respect to the Morin State Court Action to proceed with such claims, but only to the extent covered by proceeds of a Scottsdale Indemnity Employment Practices Section Insurance Policy ("Insurance Policy").

18.     On June 26, 2012, Morin assigned his interest in the 007 Application to the Trustee.  In return for the assignment and as part of the settlement of Morin's Motion for Relief from Stay, the Trustee agreed to allow Morin to pursue Debtor's Insurance Policy. When questioned during his deposition regarding his position as to his rights in the 007 Application when he assigned them to the Trustee on June 26, 2012, Morin expressed uncertainty regarding his ownership of the rights to the 007 Application, stating:

> Well, I can't assign any rights that I don't have.  And I didn't know if I
> had any, but to the extent that I had any, I didn't want them.  My position
> is that I don't have any rights to it, and the only person I had ever assigned
> it to was Innegrity, LLC.  So I assigned it to Innegrity, LLC, and if

---

[7]  Innegra asserts in the Innegra State Court Action that Debtor's ownership of the 007 Application was based upon the Original Patent Assignment from Morin (as a continuation-in-part of the parent patent, 10/983,153) and also upon the assignment in Section 9 of Morin's Employment Agreement. Debtor granted a security interest in such property to BB&T, and Innegra, in turn, obtained ownership as the purchaser from BB&T at the BB&T Sale.

somebody else wanted to contend whether or not they owned it, I didn't
care because I had contracted to assign it to Innegrity.

19.    On July 19, 2013, Innegra filed a motion seeking an order granting relief
from the automatic stay to allow it to proceed with the Innegra State Court Action.

20.    On August 29, 2013, the Trustee commenced this adversary proceeding by
filing a Complaint seeking, among other things, a declaratory judgment that the Trustee
owned the 007 Application by virtue of the June 26, 2012 assignment from Morin.

21.    On October 22, 2013, Innegra's motion for relief from stay was resolved by
consent order which allowed Innegra to pursue its state law claims against Morin and
Dreamweaver International, Inc., except as to four claims, including its request for a
declaratory judgment as to ownership of the 007 Application pending in this Court.

22.    On December 18, 2013, the jury found in the Morin State Court Action that
Debtor had breached Morin's Employment Agreement and awarded him $308,456 for
breach of contract and $73,230 for back wages.  The jury did not make a specific finding as
to when the breach occurred.


## ISSUE

The issue to be decided by the Court is whether Debtor or Morin owned the 007
Application on September 7, 2011, the date of the BB&T Sale.  If Debtor owned it on that
date, then Innegra purchased it from BB&T at the BB&T Sale, and Innegra is the present
owner of the 007 Application.  If Morin owned it, then the Trustee received an ownership
interest in the 007 Application through the June 26, 2012 assignment from Morin.

## ARGUMENTS OF THE PARTIES

Innegra contends that Debtor owned the 007 Application on September 7, 2011 pursuant to the Original Patent Assignment executed by Morin on November 5, 2004, which provided for the assignment of the underlying patent (Patent Application No. 10/983,153, now Pat. No. 7,074,483, and all divisions, and continuations thereof); pursuant to Morin's automatic assignment of all inventions to Debtor under his Employment Agreement; and by virtue of Morin's fiduciary duties as a corporate officer to assign inventions to Debtor.

The Trustee asserts that Morin owned the 007 Application on September 7, 2011, because Debtor had breached the Employment Agreement with Morin on April 15, 2009 when it reduced Morin's salary, and thus Morin had no continuing obligation to assign his new inventions/patent applications to Debtor while it continued to be in breach of the Employment Agreement. In response, Innegra argues that Morin's Employment Agreement was not breached until Morin was terminated on November 5, 2010.

## CONCLUSIONS OF LAW

### I.      Summary Judgment Standard

Under Fed. R. Civ. P. 56, which is made applicable to adversary proceedings by Fed. R. Bankr. P. 7056, summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine dispute of material fact.  Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 718-19 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S.

317, 322 (1986)).  "[T]he burden then shifts to the non-moving party to come forward with

facts sufficient to create a triable issue of fact."    Temkin, 945 F.2d at 718-19 (citing

Anderson, 477 U.S. at 247-48).    "A party asserting that a fact cannot be or is genuinely

disputed must support the assertion by: (A) citing to particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or

declarations, stipulations (including those made for the purposes of the motion only,

admissions, interrogatory answers, or other materials or (B) showing that the materials cited

do not establish the absence or presence of a genuine dispute, or that an adverse party cannot

produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).    When

demonstrating that there is a genuine dispute of material fact, the nonmoving party must

satisfy its burden by more than a "scintilla of evidence." Anderson, 477 U.S. at 252.  The

nonmoving party must present evidence upon which a jury could reasonably find in his

favor.  Id.  At the summary judgment stage, the Court must "draw all reasonable inferences

in favor of the nonmoving party and may not make credibility determinations or weigh the

evidence."  Williams v. Staples, Inc., 372 F.3d 662, 667 (4th Cir. 2004).

## II.    Analysis

### a.  Assignment of 007 Application through Original Patent Assignment

The parties do not dispute the effectiveness of the Original Patent Assignment,

through which Morin assigned to Debtor his "entire right, title, and interest in and to [the

melt-spun multifilament polyolefin yarn formation processes and yarns formed therefrom]

and [U.S. Patent Application No. 10/983,153], and all divisions, and continuations

thereof,… and all extensions, renewals, and reissues thereof…."  It is further undisputed that

Patent Application No. 10/983,153 and Patent Application No. 11/438,530 (a divisional

application of Patent No. 10/983,153), were transferred to Innegra through the BB&T Sale. The parties also agree that the 007 Application is a continuation-in-part of Patent No. 11/438,530, which is a division of No.10/983,153.

Innegra contends that the Original Patent Assignment effectively assigned to Debtor Morin's right, title and interest in the 007 Application, as a continuation-in-part of Patent No. 11/438,530. Innegra argues that Morin's Original Patent Assignment included all divisions and continuations of Patent No. 10/983,153, which includes continuations-in-part. In support of this argument, Innegra cites several cases which have held that the assignment of divisions, reissues, continuations and extensions of the assigned application effectively assigns continuation-in-part applications. See Regents of the University of New Mexico v. Knight, 321 F.3d 1111, 1119-20 (Fed. Cir. 2003) (finding, under New Mexico law, that an assignment of "all right, title, and interest in an invention" and resulting patent as well as "all divisions, reissues, continuations, and extensions thereof" was more than sufficient to obligate the inventors to assign continuation-in-part applications); Rowe Int'l Corp v. Ecast, Inc., 500 F.Supp.2d 885, 890 (N.D.Ill. 2007) (finding that an assignment of rights to improvements included future improvements and thus continuation-in part applications and stating that "the fact that the assignment does not use the magic words "continuation-in-part" is of no consequence"); Gerber Scientific Int'l, Inc. v. Satisloh AG, No. 3:07CV1382, 2009 WL 2869705, at *4 (D.Conn. Sept. 2, 2009) (holding that an assignment transferring "all its right, title and interest in, to and under said Letters Patent and patent applications and the inventions covered thereby and any divisions, reissues, continuations and extensions thereof" transferred continuation-in-part applications despite the omission of the term "continuation-in-part" from the assignment.); E.I. Du Pont de Nemours & Co. v. Okuley,

No. C2-97-1205, 2009 WL 2869705, at *26 (S.D. Ohio 2000) (stating that "[a]n assignment which conveys the entire right, title, and interest in an invention includes 'all alterations and improvements and all patents whatsoever, issued and extensions alike,'" and that the continuation-in-part applications were simply extensions of the original patent application).

The Trustee argues that the language of the Original Patent Assignment is ambiguous since it does not specifically reference "continuations-in-part" and therefore a genuine issue of fact exists as to whether the 007 Application, as a continuation-in-part, was assigned to Debtor by virtue of the Original Patent Assignment. The Trustee does not identify any cases where courts have held that an assignment must specifically reference the term "continuation-in-part" to effectively assign rights to a continuation-in-part, and relies solely upon parol evidence—Morin's testimony that it was not his intention to assign continuations-in-part when he executed the initial assignment.

Under the parol evidence rule, extrinsic evidence of agreements or understandings contemporaneous with or prior to the execution of a written contract may not be introduced to contradict, vary or explain the written instrument. Plantation A.D., LLC v. Gerald Builders of Conway, Inc., 687 S.E.2d 714, 718 (S.C. Ct. App. 2009). "However, if a contract is ambiguous, parol evidence is admissible to ascertain the true meaning of the contract and the intent of the parties." Id. (citing Klutts Resort Realty, Inc. v Down'Round Dev. Corp., 232 S.E.2d 20, 25 (S.C. 1977)). The Court must determine whether the Original Patent Assignment is ambiguous by examining the entire contract and not just isolated portions of the contract. Id. (citing Farr v. Duke Power Co., 218 S.E.2d 431, 433 (S.C. 1975)). "A contract is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire

integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business." Hawkins v. Greenwood Dev. Corp., 493 S.E.2d 875, 878 (S.C. Ct. App. 1997).

Having reviewed the Original Patent Assignment, the Court finds no ambiguity is present. The express terms of the Original Patent Assignment evidence Morin's intent to transfer his "entire right, title and interest in and to the invention and this application, and all divisions, and continuations thereof." This language does not support a reasonable interpretation that Morin intended to retain any rights in connection with this invention. Furthermore, a finding that the Original Patent Assignment included continuations-in-part is consistent with the available case law on this issue, where courts have generally interpreted "continuations" as including "continuations-in-part." No contrary authority from South Carolina courts or in other jurisdictions has been presented by the Trustee or identified by the Court.[8] Accordingly, the Court finds that consideration of Morin's testimony would be barred by the parol evidence rule for purposes of determining whether a genuine issue of fact exists as to whether Morin effectively assigned the 007 Application to Debtor through the Original Patent Assignment. For the foregoing reasons, the Court finds no genuine issue of material fact exists regarding the effectiveness of the Original Patent Assignment to assign to Debtor Morin's interest in the 007 Application, as a continuation-in-part of Patent No. 11/438,530.

### b. Assignment of 007 Application through Employment Agreement

Even if the Court were to conclude that a genuine issue of fact existed as to whether the 007 Application was assigned to Debtor by the Original Patent Assignment, Innegra further contends that Morin's interest in the 007 Application was automatically transferred

---

[8] The Court could not locate any South Carolina case.

to Debtor via his Employment Agreement with Debtor, which became effective in June of 2008. Sections 9(a) and (b) of the Employment Agreement govern Morin's obligations with regard to "Protected Information," which is defined as including "all materials and information … which [Morin] receives, gains access to, conceives, or develops or has received, gained access to, conceived or developed, in whole or in part, directly or indirectly, in connection with [Morin's] employment with [Debtor] or through the use of [Debtor's] facilities or resources." Under this definition, the information included in the 007 Application appears to constitute "Protected Information." In Section 9(b) of the Employment Agreement, Morin covenants and agrees that "all right, title and interest in any Protected Information shall be and shall remain the exclusive property of [Debtor]," and he "agrees to assign, *and automatically assign at the time of creation* of the Protected Information, without any requirement of further consideration, any right, title or interest that [Morin] may have in such Protected information." (emphasis added).   It appears to be undisputed that if the Employment Agreement was not breached at the time the invention was conceived by Morin, which was at least as early as October 30, 2009 (the date the 007 Application was filed), the 007 Application would have been transferred automatically to Debtor.[9]  See DDB Technologies, LLC v. MLB Advanced Media, L.P., 517 F.3d 1284, 1290 (Fed. Cir. 2008) ("If a contract expressly grants rights in future inventions, 'no further act [is] required once an invention [comes] into being,' and 'the transfer of title [occurs] by operation of law.'")   At the hearing, the parties focused their argument on whether the Employment Agreement was in breach at the time of creation of the Protected Information

---

[9]See Deposition of Morin, p. 21, 1-7 ("So part (b) says, 'Executive agrees to assign and automatically assigns at the time of creation of Protected Information.' So what that tells me is, that this agreement, if – you know, this agreement, not in breach, would assign the patent application to Innegrity.").

represented by the 007 Application and whether Morin's obligation to assign his rights in the Protected Information to Debtor was thus suspended. [10]

The Trustee argues that Morin's obligation to assign his right, title and interest in the Protected Information under the Employment Agreement at the time of creation was excused by Debtor's earlier material breach of that Agreement on April 15, 2009, through its reduction of Morin's salary. Relying on <u>Associated Spring Corp. v. Roy F. Wilson & Avnet, Inc.</u>, 410 F. Supp. 967 (D.S.C. 1976) and <u>Williams v. Riedman</u>, 529 S.E.2d 28, 41-42 (S.C. Ct. App. 2000), the Trustee asserts that this Court should find that Paragraph 9 of the Employment Agreement cannot be enforced because Debtor first breached the Agreement. These cases both stand for the proposition that an employer's breach of contract prior to an employee's termination or resignation precludes the employer from enforcing a restrictive covenant contained in the employment agreement, which prevented the employee from soliciting customers for a specified period following termination of his or her employment. <u>See</u> <u>Associated Spring</u>, 410 F.Supp. at 979; <u>Williams</u>, 529 S.E.2d at 41-42.

In response, Innegra contends that a breach of the Employment Agreement did not occur until Morin was terminated in November of 2010 and that the reduction in pay in April of 2009 did not constitute a breach because the salary terms were modified with Morin's agreement or acquiescence. Innegra references deposition testimony of Morin where he indicated that he agreed to reduce his pay in exchange for Debtor's agreement to treat the unpaid portion of his salary as a debt that would be repaid later. Innegra also

---

[10] In the Motion, Innegra presented argument regarding the adequacy of consideration for the assignment clause and regarding the automatic nature of the assignment, based upon the Trustee's indication in the Complaint that the assignment clause was not supported by independent consideration and that it merely created an agreement to assign, not an automatic assignment. Neither of these issues was addressed by the Trustee in his Response in Opposition or oral argument regarding the Motion, so the Court considers these arguments abandoned and therefore does not need to address them.

asserts that Morin's continued employment for approximately one year and seven months after the pay reduction constitutes acquiescence to the modification of the contract's terms. Innegra argues there is no evidence demonstrating that Morin or Debtor considered the Employment Agreement in breach at that time and no evidence indicating that Morin provided notice to Debtor prior to his termination that he considered the Employment Agreement to be breached and would thus be suspending his obligations to transfer Protected Information.[11]

Considering the totality of the evidence presented, the Court finds that no reasonable jury could find that the Employment Agreement was breached as of the date of the filing of the 007 Application.    The facts supporting this conclusion include Morin's deposition testimony that he agreed to the pay reduction; his written acknowledgment of the pay reduction;[12] his testimony that as of October 30, 2009, he had no expectation that Debtor would breach his Employment Agreement at all or to the extent that they did; his continued employment for more than a year following the pay reduction; the absence of a reference to the April 15, 2009 pay reduction in Morin's State Court Complaint (other than his pursuit of past due wages, which is consistent with his agreement to have his remaining salary accrue as a debt); Morin's testimony where he agreed that he chose to enforce and not rescind the Employment Agreement; Morin's communication and cooperation with Debtor's lawyer to file the 007 Application, which listed Debtor as the assignee; and Morin waiting until after the filing of his State Court Complaint and the BB&T Sale to file a change of

---

[11] The jury's verdict in Morin's State Court Action was not conclusive on the issue of the timing of the breach, and as stated below, there was no reference to the April 15, 2009 pay reduction in Morin's State Court Complaint as the date of the asserted breach of contract.

[12] A letter, dated April 15, 2009, from Morin on behalf of Innegrity to himself was introduced into evidence by the Trustee, which advised Morin that his current salary would be reduced by 15%.  Morin signed the acknowledgment on the letter.

correspondence with the U.S. Patent Office to have correspondence regarding the 007 Application directed to him instead of Debtor. While not conclusive, the fact that the 007 Application itself lists Debtor as the assignee supports a reasonable finding that Morin and Debtor believed the rights to the 007 Application were automatically transferred to Debtor. See U.S. Philips Corp. v. Iwasaki Elec. Co., 505 F.3d 1371, 1375 (Fed. Cir. 2007) (holding that "[although the assignation printed on the face of a patent is not a conclusive indication of the patent's current ownership, … when the information printed on the patent is correct, it is enough to put an accused infringer on notice of the patentee's identity").

Under South Carolina law, a party seeking rescission of a contract is required to provide prompt and unequivocal notice of the intention to demand rescission. ZAN, LLC v. Ripley Cove, LLC, 751 S.E.2d 664, 670 (S.C. Ct. App. 2013) (stating that when a party elects rescission as a remedy for breach of contract, the party is entitled to be restored to the position he occupied prior to the making of the contract, including a return of the consideration paid by that party). The record is devoid of evidence demonstrating that Morin gave prompt and unequivocal notice that he considered his obligations under the Employment Agreement suspended. Morin specifically denied that he gave anyone a "monologue" to plainly communicate to Debtor's board his belief that he considered the Employment Agreement in breach. Rather, the Trustee presents Morin's vague testimony regarding a "dialogue" with other board members that "we were, as a company, taking what we thought would be a temporary compromise to violate the Employment Agreement but make up for it later, and that [Morin], in good faith when it was made up for, would make up for any obligations that I had that were being set aside." Morin's testimony regarding this issue was conflicting. On the one hand, he stated that he indicated his position that he was

no longer obligated to assign Protected Information by refusing to execute an assignment at Park's request.  On the other hand, he agreed that he chose to enforce and not rescind the contract and further stated that, at the time of the filing of the 007 Application, he had no expectation that the company would breach his employment contract at all or certainly to the extent that they did—which implies a belief that the breach occurred after the filing of the 007 Application.  The Court finds that this evidence would not support a reasonable jury's conclusion that Morin provided Debtor with prompt and unequivocal notice of his intent to rescind the contract.

Furthermore, an assertion of breach of the Employment Agreement as of April 15, 2009, is contrary to the position taken by Morin in the State Court litigation that the Agreement was valid and enforceable at the time Morin was terminated on November 5, 2010.  In his deposition, Morin conceded that his decision to execute the assignment to the Trustee on June 26, 2012, was based upon his belief that it would be inconsistent to claim that the Employment Agreement was invalid and simultaneously seek damages from Debtor for breach of that Agreement.  However, he also expressed his uncertainty that he had any rights in the 007 Application to transfer as of June 26, 2012.  Since the Court finds that the evidence does not support a reasonable conclusion that the Employment Agreement was breached at the time of the creation of the Protected Information covered by the 007 Application, the cases cited by the Trustee, Associated Spring Corp. and Williams would not apply.  For the foregoing reasons, the Court also concludes that there is no genuine issue of material fact as to whether Morin's right, title and interest to the 007 Application was automatically transferred to Debtor by the Employment Agreement at the time of creation, and was thus sold to Innegra through the BB&T Sale.

### c.  *Morin's Fiduciary Duty to Assign the 007 Application*

Innegra additionally argues that Morin, as the President and Chief Executive Officer of Debtor, had a fiduciary duty to assign the 007 Application to Debtor.  As an officer and director of Debtor, Morin had a duty of loyalty to not engage in self-dealing and to not usurp corporate opportunities. In re Wordwide Wholesale Lumber, Inc., 378 B.R. 120, 126 (Bankr. D.S.C. 2007).   Even if Morin's attempt to retain ownership of the 007 Application was viewed as self-dealing and a breach of his fiduciary and statutory duties under South Carolina law, such a breach would give rise to a claim in favor of Debtor for breach of fiduciary duty or grounds for an injunction to be issued requiring Morin to transfer such rights, and would not result in the automatic transfer of such rights to Debtor prior to the BB&T Sale, such that they could have been transferred to Innegra. See Schultz v. IGPS Co., LLC, No. 10-C-71, 2011 WL 3651267, at *6 (finding that the sole-shareholder and president of a corporation owed a fiduciary duty under New York law to assign the patents to the corporation, and arguably, breached that duty; however, the mere fact that the president breached the duty does not mean that the rights to the patent he acquired were automatically transferred to the corporation).  Nevertheless, since the Court has previously concluded that Morin transferred his right, title and interest to the 007 Application either through the Original Patent Assignment or through the Employment Agreement, it is unnecessary to ultimately conclude whether any rights were transferred as a result of any breach of fiduciary duty by Morin.

## CONCLUSION

Based upon the foregoing, the Court concludes that no genuine issue of material fact exists as to whether Debtor owned the 007 Application on September 7, 2011, the date of

the BB&T Sale to Innegra.  Accordingly, Innegra's Motion for Partial Summary Judgment is

granted, and Innegra is hereby declared to be the sole owner of the 007 Application.  Since

Morin and Dreamweaver did not respond to the Motion and have not otherwise asserted a

present ownership interest in the 007 Application in this adversary proceeding, the Trustee's

claim for declaratory judgment as to the ownership of the 007 Application is also resolved as

to these parties in favor of Innegra.

**AND IT IS SO ORDERED.**

**FILED BY THE COURT**
**01/13/2015**



John E Waites

US Bankruptcy Judge
District of South Carolina

Entered: 01/13/2015